**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 12-2810

———————————

UNITED STATES OF AMERICA

v.

REGINALD BROWN,
                            Appellant

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 09-cr-602-3)
District Judge:  Hon. C. Darnell Jones, II

———————————

Submitted Under Third Circuit LAR 34.1(a)
October 18, 2013

Before:   RENDELL, JORDAN and LIPEZ*, *Circuit Judges.*

(Opinion Filed: October 21, 2013)

———————————

OPINION OF THE COURT

———————————

JORDAN, *Circuit Judge*.

    Reginald Brown appeals an order of the United States District Court for the

Eastern District of Pennsylvania denying his motion for a judgment of acquittal.  He

———————————
    * Honorable Kermit V. Lipez, United States Court of Appeals Senior Judge for the
First Circuit, sitting by designation.

contends that the evidence was not sufficient to sustain a conviction for conspiracy. It was, and we will affirm.

## I.      Background[1]

On multiple occasions in 2009, Brown sold crack cocaine to Kile Lowman, a drug dealer under surveillance by the Drug Enforcement Administration ("DEA"). During that time, Brown sold Lowman "approximately a quarter-ounce of crack cocaine … once or twice a week." (Appellee's Br. at 8.) There were also 89 telephone calls between Lowman and Brown from March to September 2009. According to Lowman, the purpose of those calls was "sex and drugs," the "drugs" portion dealing specifically with Lowman's purchase of crack from Brown. (App. at 402-03.) At Brown's trial, Lowman testified about occasions on which he purchased crack from Brown for third parties who turned out to be informants working with the DEA. During one such transaction, Lowman went to Brown's house to buy crack for himself and a customer known as "Old Head." On a call recorded by the DEA, Lowman, apparently referring to the quality of the drugs, told Old Head that "[Brown] said this is some super hammer ….." (Supplemental App. at 136.) He also said that "[Brown] wanted to know what happened to me … I been sick dog." (*Id.*) On two other occasions, Lowman brought "Ian," another customer and DEA informant, to the street outside Brown's house to purchase crack. The first time, in August 2009, Brown was late and Lowman and Ian had to wait for him. Lowman called Brown to see where he was. After that phone conversation,

---

[1] In accordance with our standard of review, see *infra* note 2, we set forth the facts in the light most favorable to the government.

Lowman told Ian that Brown offered to buy them food because of the wait. Later, Lowman received twenty-dollars from Brown "for bringing him Ian." (App. at 237.) On another occasion, Lowman brought Ian to Brown to buy crack and Brown agreed that he would be willing to do deals directly with Ian in the future for "a dollar a piece," *i.e.*, a thousand dollars. (App. at 248.) Lowman testified that he agreed to this "[s]o we can keep him coming" and that he negotiated the price with Brown. (App. at 248.) Lowman indicated that Ian was in his debt because "we lowered the price." (App. at 249.)

Eventually, Lowman was arrested. When he went to jail, he made sure that Ian and Brown were in touch so that Ian could buy crack directly from Brown. Ian told Brown that he knew Lowman had been making money off their past transactions and that he, Ian, would get money to Lowman in jail. He testified that he told Brown "[t]hat whenever I do purchase the – the crack cocaine … , I'll make sure [Lowman] continues to get money from it." (App. at 509.) Brown evidently did nothing to disabuse Ian of the idea that Lowman should be part of the future deals.

In 2011, Brown was charged with distributing crack and aiding and abetting Lowman in the distribution of crack, as well as conspiring with Lowman to distribute crack. At his jury trial, Brown conceded his culpability on the distribution charges and the aiding and abetting charges, but challenged the conspiracy charge. After the government's case, he filed a motion for judgment of acquittal on that charge under Federal Rule of Criminal Procedure 29(a). The District Court denied the motion and the jury found Brown guilty of conspiracy. He again moved for judgment of acquittal,

3

challenging the sufficiency of the evidence on conspiracy, and the Court denied the motion.

Brown then filed this timely appeal.

## II.    **Discussion**[2]

Brown argues that the evidence, even viewed in the light most favorable to the government, was insufficient to sustain a conviction for conspiracy because only a buyer-seller relationship with Lowman was proven.  We disagree.

The essential elements of a drug conspiracy are: (1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal.  *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008).[3]  "The final factor – an agreement between the defendant and some other person – is the essence of the offense."  *United States v. Pressler*, 256 F.3d 144, 147 (3d Cir. 2001) (holding the evidence was insufficient to establish a conspiracy when it did not show an agreement between conspirators to work together).  Because there is rarely an

---

[2] The District Court had subject matter jurisdiction over this case under 18 U.S.C. § 3231.  We exercise jurisdiction over Brown's appeal pursuant to 28 U.S.C. § 1291.  We review the denial of a motion for judgment of acquittal *de novo*, viewing the evidence in the light most favorable to the government.  *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006).  A jury verdict will be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

[3] In a conspiracy charged under 21 U.S.C. § 846, the government is not required to prove any overt acts in furtherance of the conspiracy.  *United States v. Shabani*, 513 U.S. 10, 17 (1994).  However, to establish more than a buyer-seller relationship, the government must proffer sufficient evidence that the drug transactions were a "step in achieving the conspiracy's common goal of distributing [drugs] for profit."  *United States v. Perez*, 280 F.3d 318, 343 (3d Cir. 2002) (quoting *United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir. 1989)).

express agreement to break the law, the existence of a conspiracy is generally inferred from circumstantial evidence. *Cf. United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) (holding that buyer shared conspiracy's goal of distributing cocaine, when evidence showed he bought on credit and knew about the larger drug operation, among other evidence). However, it is well established that a buyer-seller relationship, without more, is insufficient to establish a conspiracy. *Id.*; *see, e.g.*, *United States v. Price*, 13 F.3d 711, 727 (3d Cir. 1994) (reviewing cases establishing that a buyer-seller relationship standing alone is not a conspiracy). Our decision in *Gibbs* lays out a set of non-exclusive factors to consider when determining whether a defendant is a member of a drug conspiracy, including: (1) how long the defendant was affiliated with members of the conspiracy; (2) whether there is an established method of payment in the transactions; (3) whether the transactions are standardized in other ways; and (4) whether there is a demonstrated level of mutual trust. 190 F.3d at 199. In the end, "a conspiracy conviction may stand *only* if the Government proves the existence of an underlying agreement." *Pressler*, 256 F.3d at 157 (emphasis in original).

Brown contends that the evidence here establishes nothing more than a buyer-seller relationship. Citing two examples from *Gibbs* – the exchange of "large amounts of drugs" and a "credit relationship" – he draws a contrast with this case, saying the quantities of crack involved here were relatively small and there was no credit extended. There was thus, in his eyes, insufficient evidence of "mutual trust" between himself and Lowman. (Appellant's Opening Br. at 14 (quoting *Gibbs*, 190 F.3d at 199-200).) We are not persuaded. A large amount of drugs may reflect trust but a smaller amount does not

5

show a lack of it. Likewise, while it is true that there was not a credit relationship between Brown and Lowman, that kind of relationship is not essential to proof of a conspiracy. *See Gibbs*, 190 F.3d at 199 (noting that the listed "factors are not necessarily dispositive"). A dealer's invitation to the defendant to come into a house with drugs in plain view can "reflect[] a level of mutual trust consistent with conspiracy." *Iglesias*, 535 F.3d at 156. So too can multiple contacts over an extended period of time. *Cf. United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002) (finding sufficient evidence when defendants were at the house in which drugs were sold and had repeated past dealings, including numerous calls when drug shipments came in, with the conspiracy leaders). Here, Lowman went into Brown's house and Brown told him about the "super hammer" quality of his drugs. (Supplemental App. at 136.) Brown had phone contact with Lowman with great frequency and, when Lowman was out of contact, Brown wanted to know why. The dealing that both of them did jointly with DEA informants also reflects a mutuality of purpose beyond a mere buyer-seller relationship. There is some evidence that Brown shared his profits, since he paid Lowman for bringing Ian in as a customer, and Lowman described negotiations with Ian as a joint enterprise: "[s]o *we* can keep him coming," "*we* lowered the price." (App. at 248-49 (emphasis added).) Additionally, it can be inferred that Brown agreed to help Lowman while he was in jail by selling to Ian. That evidence is enough to allow the conclusion that Brown and Lowman "agreed to pool their efforts." *Pressler*, 256 F.3d at 154 (internal quotation marks omitted).

Next, Brown argues that he "derived no benefit from these sales after the crack left his hands." (Appellant's Opening Br. at 17.) Reviewing the record in the light most

6

favorable to the government, however, the jury could have readily concluded that Brown benefitted from the sales because at least one customer, Ian, continued to buy drugs from Brown even after Lowman went to jail. Brown also appears to claim that he was not Lowman's sole source of supply for crack and therefore he and Lowman were not co-conspirators. Even if it were true that Lowman had other suppliers, however, exclusivity is not required to establish a conspiracy. *Cf. Perez*, 280 F.3d at 343 (noting that even an occasional buyer can be a member of a conspiracy).

Looking at the evidence as a whole and in the light most favorable to the government, as we must, there is sufficient evidence for a rational jury to conclude that Brown and Lowman had an agreement to achieve the common goal of distributing crack cocaine.

**III.    Conclusion**

For the foregoing reasons, we will affirm the judgment of the District Court.